IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

EUGENE BARATTO and
TEXTURES, LLC,

OPINION AND ORDER

              Plaintiffs,

08-cv-657-slc

    v.

BRUSHSTROKES FINE ART, INC.,

              Defendant.

---

In this patent infringement lawsuit, plaintiffs Eugene Baratto and Textures, Inc. allege that defendant Brushstrokes Fine Art, Inc.'s art reproductions infringe claim 1 of United States Patent No. 5,721,041 (the '041 patent), which discloses a method of reproducing the brushstrokes found in original paintings. Now before the court is Brushstrokes's motion for summary judgment on plaintiffs' infringement and damages claims and its invalidity and laches counterclaims and defenses. Dkt. 44. Plaintiffs oppose summary judgment except as it relates to their claim for lost profits and the dismissal of Textures, LLC, the non-exclusive licensee of Baratto's patent. Dkt. 52.

As requested by the parties, I am dismissing plaintiff Textures, LLC and Baratto's claim for lost profits.

I conclude that Baratto has failed to adduce sufficient proof to allow a reasonable jury to find that Brushstrokes's reproductions infringe every element of the '041 patent. Therefore, Brushstrokes is entitled to summary judgment on Baratto's infringement claims. As a result, it is not necessary to reach Brushstrokes's counterclaim of invalidity, its laches defense or its request to limit Baratto's damages.

PRELIMINARY MATTERS

Before discussing the merits of Brushstrokes's motion for summary judgment, I must rule on some critical evidentiary disputes:

## I. Emslander's January 27, 2010 Affidavit

Brushstrokes contends that paragraphs 5-9 and 11-19 of the January 27, 2010 affidavit of Jeffrey Emslander, Baratto's expert witness, should be stricken pursuant to Fed. R. Civ. P. 37(b) because it is an improper attempt by Emslander to enlarge upon his original report. Dkt. 63. Related to that motion, Brushstrokes asks for leave to file a reply brief in support of its motion. Dkt. 68. Although this court does not usually allow reply briefs on discovery motions, Brushstrokes's reply brief is helpful in this instance, so I will consider it.

According to the preliminary pretrial conference order, the parties were required to disclose all expert witnesses in accordance with Fed. R. Civ. P. 26(a)(2)(A), (B) and (C) by September 25, 2009 for the proponent and by October 26, 2009 for the respondent, with replies to be filed by November 9, 2009. Dkt. 15 at 3. The preliminary pretrial order specified that:

> There shall be no third round of rebuttal expert reports. Supplementation pursuant to Rule 26(e)(1) is limited to matters raised in an expert's first report, must be in writing and must be served not later than five calendar days before the expert's deposition, or before the general discovery cutoff if no one deposes the expert. . . . Failure to comply with these deadlines and procedures could result in the court striking the testimony of a party's expert pursuant to Rule 37.

*Id.* at 4.

2

This paragraph flagged and highlighted this court's well-known antipathy to a party's post-deposition revelation of new expert information that did not qualify as actual supplementation. In other words, the stated deadlines applied across the board so that a party could not invoke Rule 26(e)(2)'s looser deadlines as an excuse for the late disclosure of new information. This court imposes these requirements in every patent case in order to implement its longstanding policy of promoting fairness, efficiency and predictability by setting and strictly enforcing tight expert disclosure deadlines. *See Z Trim Holdings, Inc. v. Fiberstar, Inc.*, 2007 WL 5462414, *2 (W.D. Wis. Sep. 26, 2007). As this court stated,

> A timely *supplemental* expert report is allowable, but it must be an actual supplement, not a new and different set of opinions. In patent lawsuits filed in this court, moving targets are highly disfavored, late-presented moving targets are anathemas.

*Id.* at *2, emphasis in original.

Emslander submitted his affidavit long after the expiration of the expert report filing deadline but prior to the general discovery cutoff. It does not appear that he has been deposed. Therefore and pursuant to this court's pretrial conference order, to be considered, his affidavit must meet the requirements of Rule 26(e)(1), which allows a party to supplement or correct its Rule 26(a) disclosures "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Supplementation "is intended to provide parties an opportunity to correct mistakes and oversights, not to include new examples and illustrations that could have been included in an original expert report." *Innogenetics N.V. v. Abbott Laboratories*, 2006 WL 6000791, *1 (W.D. Wis. Aug. 3, 2006).

3

Baratto contends that paragraphs 5-9 of Emslander's affidavit in large part clarify the testing procedures described in his original report. I agree. In his original report, Emslander states that he performed both spectrometric and elongation testing on Brushstrokes's Hallaryd art reproductions. Emslander Rept., dkt. 57, Exh. 1 at 1-2. Spectrometric testing identifies the characteristics of the plastics and elongation testing characterizes the tear strength. *Id.* Emslander's report indicates that he performed elongation testing on two different occasions: 1) August 4, 2008 tests on Hallaryd reproductions provided by Baratto; and 2) April 29, 2009 tests on a different Hallaryd reproduction purchased from IKEA. *Id.* at 2. Later in the report, he indicates that he performed elongation testing on three strips that he cut in "both directions"—meaning horizontally and vertically—from each art reproduction. *Id.* at 4. Spectrometric testing was performed on "two duplicate samples [or strips] of a Brushstrokes art reproduction." Finally, in the results section of his report, Emslander states that he performed elongation tests "on four different samples of Brushworks art reproductions to ensure repeatability of results on different pieces of work." He made the following findings:

> Three of the four samples showed breaking of the substrate before any cracking occurred in the thermoplastic layer. The fourth sample showed immediate tearing of the thermoplastic layer when the test began. This differed from the other test results. Upon further inspection, the art reproduction sample showed an area of very high texture. It was apparent that there were high stress concentrations in the areas of high texture and there appeared to be small cracks in these areas of high texture before the testing was instituted. This exception can be easily explained because the cracks present in the thermoplastic were present initially and continued to widen when the Instron testing was initiated. Testing samples of the fourth art reproduction using strips cut from a non-highly textured area resulted in the same results as the other three samples.

*Id.* at 9.

Although Emslander does not say so directly, I reasonably can infer from his report that he tested four Hallaryd reproductions—3 in 2008 and 1 in 2009—by removing a total of 6 strips (3 horizontally and 3 vertically) from each reproduction. Emslander clarifies this fact in the first 4 sentences of paragraph 5 of his affidavit. Because Emslander merely is attempting to resolve confusion over how many products he tested and how many samples he removed from each product, these statements do not enlarge the scope of his original report or introduce a new opinion.

Paragraphs 6-9 of Emslander's affidavit discuss his findings with respect to the elongation testing of the four reproductions. Although more clearly articulated, these paragraphs accurately restate the findings noted in his earlier report. The biggest discrepancy is that Emslander explains that he retested two strips with low texture from the third reproduction in 2009 and found the thermoplastic layer did not crack before the canvas broke. The new information about the date and number of samples taken for the retest constitute only minor additions to the original report. Therefore, they will be considered.

Although Baratto admits that the last three sentences of paragraph 5 and paragraphs 11-19 of Emslander's affidavit state opinions not contained in the original report, he asserts that such opinions are justified because of Brushstrokes's late filing of an expert affidavit and a response to discovery requests. At the end of paragraph 5 in his affidavit, Emslander discusses the varying degrees of texture found in each of the test strips that he collected. In paragraphs 15-19 of his affidavit, Emslander describes the test equipment and protocols that he used, states the opinion that Brushstrokes's ink is thermoplastic and generally concludes that testing each accused product is unnecessary.

5

Baratto argues that these opinions are necessary to respond to the January 8, 2010 affidavit filed by John Hasting, Brushstrokes's expert, in support of summary judgment.  Dkt. 49.  However, Baratto is not entitled to introduce new expert opinions just because he believes that Brushstrokes did the same.  The appropriate recourse would have been for Baratto to put Hasting and Brushstrokes on the receiving end of a motion to strike, not to respond with new expert tests and opinions intended to thwart Brushstrokes's motion for summary judgment.  This court could not have made it clearer to both sides that it would not countenance sandbagging of this sort.

Yet much of the additional information in Emslander's January 27, 2010 affidavit relates to Brushstrokes's contention in its January 8, 2010 summary judgment motion that each of its products is unique and cannot be grouped together for purposes of infringement.  However, Baratto was on notice that he would have to identify each of the accused products and how each product infringed the patent-in-suit.  *See, e.g.,* Prelim. Pretr. Conf. Ord., dkt. 15 at 2 ("A party may not assert a claim or accuse a device that is not specifically identified in the pleadings.").  Therefore, if Baratto believed that the additional information was important to his case, then he should have made sure that Emslander disclosed it in his opening report.

Baratto's arguments with respect to paragraphs 11-14 of Emslander's affidavit fail for similar reasons.  In those paragraphs, Emslander describes tests that he performed on January 15, 2010 on two additional art reproductions provided by Brushstrokes.  Baratto contends that this information was not contained in the original expert report because Brushstrokes did not state that it made art reproductions with PVC as well as polystyrene in its initial Rule 26 disclosures, and did not produce samples of these reproductions until January 2010.  Baratto

long should have been aware that Brushstrokes made such products and that testing them would be essential to proving its infringement claims. As noted above, it is Baratto's burden as plaintiff to identify the products that he believes infringe his patent, and this information was readily available. It is undisputed that Brushstrokes's art reproductions long have been available through catalogs and the internet as well as through IKEA. Baratto could have and should have bought samples if he wanted them—in fact, he should have done so before filing his lawsuit. Additionally, if Baratto had concerns about Brushstrokes's lack of response to his discovery requests, he should have sought a motion to compel when the problem first arose. *WNS Holdings, LLC v. United Parcel Service, Inc.*, 2009 WL 2136961, *5 (W.D. Wis. Jul. 14, 2009). As stated in the preliminary pretrial conference order:

> Parties are to undertake discovery in a manner that allows them to make or respond to dispositive motions within the scheduled deadlines.
>
> *       *       *
>
> This court also expects the parties to file discovery motions promptly if self-help fails. Parties who fail to do so may not seek to change the schedule on the ground that discovery proceeded too slowly to meet the deadlines set in this order.

Dkt. 15 at 6.

In sum, Brushstrokes's motion to strike will be granted in part and denied in part: I will disregard any proposed facts supported by the last 3 sentences of paragraph 5 and paragraphs 11-19 of the untimely supplement. I will consider the first 4 sentences of paragraph 5 and paragraphs 6-9 of the affidavit. Baratto's late addition of these new opinions was neither justified nor harmless. *Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998). To the extent that this decision wounds Baratto's lawsuit, the wound is self-inflicted.

## II.  Baratto's Declaration

Baratto proposes several findings of fact based on his personal averments as the patent's inventor.  *See* Plf.'s PFOF, dkt. 53; Baratto Aff., dkt. 56.  Brushstrokes objects to these proposed findings to the extent that Baratto is offering his personal interpretation or opinion as the inventor of the patent-in-suit.  *See* Def.'s Resp. to Plf.'s PFOF 16, 18-20, 28, 35-36, dkt. 60.  For example, Baratto avers that the '041 patent describes a product with elongation characteristics based on the use of an adhesive whereby the textured colored sheet and the substrate are not fused or welded together.  *Id.* at PFOF 28.  Brushstrokes correctly argues that Baratto cannot support this fact merely with his own testimony, as he attempts to do.  The Court of Appeals for the Federal Circuit repeatedly has held that an inventor's personal construction of his patent is of little probative value.  *E-Pass Technologies, Inc. v. 3com Corp.*, 343 F.3d 1364, 1370 n. 5 (Fed. Cir. 2003); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 983 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) ("testimony about construction, however, amounts to no more than legal opinion—it is precisely the process of construction that the court must undertake").  The patent speaks for itself and Baratto's opinion on how it should be interpreted is largely irrelevant.

More importantly, Baratto has not been named or qualified as an expert witness under Fed. R. Civ. P. 26(a)(2).  Therefore, to the extent that Baratto provides expert testimony, that testimony violates the court's preliminary pretrial conference order and F.R. Ev. 702 and Fed. R. Civ. P. 37, which states that a failure to disclose an expert or supplement his testimony prevents the party proposing the testimony from using "that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or

is harmless."  Nonetheless, Baratto is not prevented from testifying as a lay witness on matters within his personal knowledge.  Thus, the issue is whether his testimony is more accurately characterized as lay or expert testimony.

Under F.R. Ev. 602, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Under Rule 701, a lay witness may testify about his opinions or inferences that are:  "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Subsection (c) "eliminate[s] the risk that the reliability requirements set forth in Rule 702 [would] be evaded through the simple expedient of proffering an expert in lay witness clothing."  F.R. Ev. 701, advisory committee note (2000).  The relevant distinction is between expert and lay *testimony*, not expert and lay *witnesses*. *Id.*  In other words, "it is possible for the same witness to provide both lay and expert testimony in a single case." *Id.*

Patent lawsuits are rife with disputes over whether testimony that is based on personal perceptions and intimate understanding of the invention is particularized or specialized. *E.g.*, *WNS Holdings, LLC*, 2009 WL 2136961, at *2-3 (disputing whether employee's testimony was lay or expert).  As this court noted in *WNS*, "[t]estimony is expert in nature when it is the type that 'could have been offered by any individual with specialized knowledge of the [relevant topic].'" 2009 WL 2136961, at *2 (emphasis and alteration in original) (citing *United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002)).  Here, as in *WNS*, some of Baratto's averments are expert testimony and some are lay testimony.  His averments relating to how the invention is

supposed to function and how those functions relate to any of the accused products in this case, dkt. 56, ¶¶ 7 and 12, clearly constitute expert testimony.  It would be impossible for an untrained layman to speak to these matters.  Accordingly, paragraphs 7 and 12 of Baratto's declaration are expert testimony and cannot be used to support proposed findings of fact because he never disclosed himself as an expert.  I will disregard the proposed facts supported by Baratto's declaration to which Brushstrokes has objected.  Baratto's remaining averments are lay testimony under Rules 602 and 701.

Brushstrokes also challenges some of Baratto's averments as inadmissible as hearsay.  *See* Def.'s Resp. to Plf.'s PFOF 30, 33-34 and 45, dkt. 60.  To the extent that Baratto proposes as fact a statement that was made to him by a third party and about which he has no personal knowledge, those proposed facts will be disregarded.

## FACTS

For the purpose of deciding defendant's motion for summary judgment, I find that the following facts are undisputed and material:

## I.  The Parties

Plaintiff Eugene Baratto resides in Somerset, Wisconsin.  He is a chemical engineer retired from 3M, where he worked in product development.  Plaintiff Textures LLC is a Wisconsin limited liability company with its principal place of business in Somerset, Wisconsin. Baratto is the named inventor on United States Patent Number 5,721,041 entitled "Art Reproduction and Method."  Textures LLC has a non-exclusive license to the '041 patent.

Defendant Brushstrokes Fine Art, Inc. is a foreign corporation with its principal place of business in Ontario Canada.  In January 2003, Brushstrokes bought the assets of Atelier America, Inc. and began selling art reproductions.  Between 1995 and 1999, Atelier marketed its products by sending out millions of catalogs annually.  Around 1999, Atelier created a website and started to sell its Brushstrokes art online.  In 2000, Atelier spent approximately $1 million creating a new website to aggressively pursue e-commerce for its art.  Since that time, Brushstrokes art has been marketed and sold online.

## II.  The Patent -In-Suit

The '041 patent application was filed on March 5, 1996 and the patent issued on February 24, 1998.  Claim 1 of the '041 patent states:

> An art reproduction comprising a substrate, a textured colored sheet comprising a color layer and a flexible thermoplastic sheet comprising a color layer and a flexible adhesive disposed between the substrate and the sheet, wherein the color layer of the sheet is exposed, and the thermoplastic layer of the sheet is laminated to the substrate, and wherein said reproduction has sufficient elongation so that when it is stretched, the adhesive and thermoplastic sheet elongate with the substrate to the breaking point of the substrate, and the reproduction does not crack.

The background section of the patent instructs that:

> Some of the currently available reproductions have been reported to crack during stretching and stapling, and some crack after they have been mounted on stretcher bars.
>
> *   *   *
>
> There remains an ongoing desire and need for high quality art reproductions that have good color and texture fidelity from one reproduction to another, and that can be stretched and mounted without cracking.

Col. 1, lns. 34-37; Col. 2, lns. 47-51.

11

The patent specification teaches:

> The art reproductions of the invention are flexible composites comprising a substrate that is adhesively bonded to a textured thermoplastic sheet comprising at least a color layer and a thermoplastic layer, and an optional reinforcing layer, which is also referred to as a reinforcing sheet.
>
> The flexible art reproductions of the invention can be mounted using conventional methods and materials used for canvas prints without cracking the reproduction.
>
> *   *   *
>
> The art reproductions of the invention have sufficient elongation, i.e. stretch, and flexibility so that when they are stretched during mounting, they will not crack.  When the reproduction is stretched at a speed of 5 inches per minute, the entire composite stretches to the breaking point without cracking.

Col. 3, lns. 47-54 and 57-62.

> Elongation is defined as the mount [*sic*] that a strip of the composite stretches before breaking.  For example, a 2 inch long strip that stretches to 2.5 inches before breaking has a stretch of 25%.

Col. 3, lns. 66-67; col. 4, lns. 1-2.

> If a reproduction is stiff or brittle, stresses from stretching will cause cracking in the reproduction.  When the components of the reproduction are flexible and can elongate when stretched, the stresses from stretching are alleviated and cracking is avoided.

Col. 4, lns. 8-13.

> In the practice of the invention, flexible adhesives are useful in bonding thermoplastics sheets to substrates than can be more or less rigid than the sheets.

Col. 5, lns. 10-12.

During stretching and mounting of the art reproduction, it is believed that the pressure-sensitive adhesive deforms sufficiently to alleviate the stresses caused during stretching of more rigid materials which may lead to cracking of the reproduction. The adhesive also stretches with the substrate and sheets so that inherent stresses are alleviated. Composites that are fused or welded together may not possess sufficient flexibility to alleviate the stresses during stretching.

The colored sheet of the invention comprises a thermoplastic layer and a printed color layer that is also thermoplastic. By thermoplastic, it is meant that the material exhibits plastic deformation or flow when heated. As used herein, the thermoplastic layer may also be referred to as a thermoplastic film.

Col. 5, lns. 19-32.

The thermoplastic layer or film is printed to provide a colored sheet, i.e., a printed sheet, having a thermoplastic layer and a printed or colored image layer. Printing can be done with the state of the art permanent printing inks using existing processes and equipment. Preferably the inks are compounded in a thermally stable binder for heat resistant during the thermoforming, are fast drying during the printing process and are permanent.

Col. 6, lns. 47-54.

A clear protective coating or a gloss control clear coat can further be applied to the laminated three dimensional reproduction.

Col. 7, lns. 66-67.

Gloss control clear coats can be applied to provide matte or high gloss appearances to the reproduction as desired.

Col. 8, lns. 1-3.

In correspondence submitted to the patent office during the prosecution of the '041

patent, Baratto stated:

The present invention further requires that the art reproduction including the color layer, the thermoplastic film, the substrate, and the adhesive can be stretched to the point of breaking without

cracking the reproduction.  Not cracking during stretching is an important requirement for an art reproduction because the reproduction is stretched on stretcher bars used for originals to remove any creases or bulges in the reproduction which may distort the painting.  Stretching can cause cracking either on the colored surface of the reproduction, throughout the entire composite that is the reproduction, or both.

## III.  Brushstrokes's Products

Since 2003, Brushstrokes has sold hundreds of different art reproductions depicting distinct images in various sizes through direct-to-consumer catalogs and its website. Brushstrokes's competitive advantage is that its art reproductions have three-dimensional texture simulating the brushwork of original oil paintings.  If a Brushstrokes image is placed side-by-side with the original image, it is extremely difficult to distinguish one from the other.   A Brushstrokes image contains areas with varying textures and many areas of texture at random points across the image.  To do this, it creates a unique mold for each image that simulates all of the three-dimensional brushwork and texture of the original artwork.   Brushstrokes's competitors sell art that is two-dimensional or flat and that does not recreate any of the texture of the original art.  Brushstrokes has never sold flat images with no texture.

All of Brushstrokes's art reproductions have a canvas, color ink printing, plastic and adhesive.  Brushstrokes and its predecessor, Atelier, always have used approximately the same processes and materials to produce their art reproductions.  First, an image is selected and a number of copies are printed with colored ink on a plastic substrate made of PVC or polystyrene. A copy of the image also is printed on a canvas, and a Brushstrokes artist uses this image as a base to overpaint the entire image in order to create three-dimensional texture that normally is present only in original oil paintings.  The overpainted image is called the "semi-original."

14

Because of this process, each image sold by Brushstrokes has its own unique texturization. An epoxy mold then is created from the semi-original image. A single PVC or polystyrene image is placed on the epoxy mold of that same image in a vac-forming machine. Brushstrokes uses a proprietary vac-forming machine that heats the plastic substrate for a period of time, allowing it to take on the three-dimensional relief of the epoxy mold.

After the plastic substrate is cooled, a sheet of canvas is glued to its reverse side using a water-based glue. After the glue dries, the corners of the image are cut and the image is stretched around a wooden stretcher bar to provide its final shape. During stretching, an employee grips the edge of the image at one spot with a tool called a gripper and pulls the edge at a right angle around the stretcher bar to a point of suitable tautness. The worker then staples the image to the stretcher bar on the side or reverse of the stretcher bar. The worker uses this process sequentially around the entire circumference of the image until it is fully stapled to the stretcher bar on all four sides. It is very important that the image be stretched around the stretcher bar tightly enough that it fits snugly but not so tightly that it does not have any give. The give allows the plastic substrate to contract or expand based on the temperature of the surrounding environment. Images may be subject to extreme temperatures during shipping. Therefore, the image must not be stretched in a manner that will cause it to sag during extreme heat or crack during extreme cold. Brushstrokes never stretches its art reproductions to the breaking point of the substrate. Since 1999, Brushstrokes has applied to the image a patented coating comprised of a synthetic resin containing glass beads. The coating lends a realistic texture to the surface of the reproduction and protects the image from ultraviolet light.

Areas of the image with greater texture are thinner and more prone to tearing than areas with little or no texture. The vac-forming stretches the plastic in the areas with texture, making the plastic thinner and more likely to crack when the entire plastic sheet is pulled during stretching.

The only changes in this process over the years were the addition of the coating in 1999 and the manner in which Brushstrokes captures the images from the original paintings. Before 2004, Brushstrokes printed all imagery only on PVC. In 2004, it began selling products through retailers, including 6 images marketed by IKEA under the Hallayrd brand. Images sold to IKEA are printed on polystyrene and adhered to a canvas made in Mexico. Images sold via catalog or other means are printed on PVC and adhered to either a Mexican or domestic canvas. The images that Brushstrokes sells in catalogs are very high quality and sell for hundreds or thousands of dollars. The images sold at IKEA retail for $100 -$200. Brushstrokes also sells art reproductions that are not from paintings or mounted on canvas (including reproductions of sculptures and reproductions printed on note cards).

## IV.  Accused Products and Grouping

In his complaint, Baratto accused Brushstrokes's "art reproduction product" of infringement but did not identify the specific images or versions that he was accusing. During discovery in August 2009, Baratto asked Brushstrokes to identify all of its art reproductions. Brushstrokes objected to the interrogatory as overbroad and unduly burdensome because the accused products had not yet been identified in the litigation. However, Brushstrokes produced a list of its art reproduction painting products on September 25, 2009.

In its discovery requests, Brushstrokes asked Baratto to identify the accused products and provide factual support for his infringement contentions on a product-by-product and limitation-by-limitation basis. On December 31, 2009, Baratto responded that he objected to the product identification interrogatory on the following grounds:

> [T]he word "product" is undefined by defendant and has several meanings. Plaintiffs answer the interrogatory identifying their product on their current Brushstrokes website. Plaintiffs also maintain that the interrogatory is premature because Brushstrokes has failed to identify with particularity what product it sells. Subject to such limitation, without waiving same, under the headnote Collections, we believe the following products infringe: home décor, abstract designer, figurative florals, landscapes, museum signature, still life, miniatures, contemporary miniatures, and tapestries. We do not believe the following products infringe: sculptures or gift center. Under the headnote Museum Style, the product infringes. Under the headnote Photo Heirlooms, the product does not infringe. Under headnote Portraits by Brushstrokes, the product does not infringe.

Baratto also responded that all of Brushstrokes's art reproductions infringe and meet the limitations of Claim 1 of the '041 patent and cited Emslander's expert reports as factual support.

## V.  Expert Witness Findings

### A.  Hasting

John Hasting is the Chief Operating Officer of Brushstrokes. As part of his responsibilities with Brushstrokes, Hasting spends time looking at competitive products in retail stores. Over the years, he often has seen other products that combine a colored layer of plastic or some type of film which then is adhered on its reverse side to canvas and then stretched around a stretcher bar. These products are widely available in the market and are not unique.

A Brushstrokes image is printed directly on a PVC or polystyrene sheet using inks that are normally used by each printer; it is not printed on a printed color layer that is thermoplastic.

Hasting tested four variations of ten different Brushstrokes images (forty total samples) by stretching the entire art reproductions to the point that either the plastic or canvas tore.  In all cases, the plastic tore before any strain could be seen on the canvas sheet.  The PVC images were particularly brittle and tore faster than the polystyrene sheets.  Areas with greater texture were more prone to tearing than areas with little or no texture.  Because all Brushstrokes's images have unique texturization, one cannot conclude from the testing of one image that another image would perform similarly.

Hasting has observed the stretching of hundreds of thousands of plastic sheets glued to canvas and discussed it with other workers in Brushstrokes's facility.  In his experience, when an image tears and has to be discarded, it is the plastic substrate that has torn and not the canvas substrate attached to it.  No one surveyed in the Brushstrokes's facility recalled a single instance in which the canvas sheet tore but the plastic substrate did not.

### B.  Emslander

Baratto's expert witness, Jeffrey Emslander, has a BS degree in chemical engineering from the University of Minnesota and has worked at 3M for 25 years as a product development engineer and specialist developing new plastic films for backing and other uses.  As part of his job, he performs multiple tests to understand the properties of the plastic films, including tear strength and elongation.  Emslander is familiar with and has participated in the process of patenting new films, backings and other materials.

18

To test Brushstrokes's products, Emslander removed the art reproduction from the frame and stretcher bars and cut 1-inch strips from it. He then subjected the strips to carefully controlled stretching on an Instron apparatus. The Instron has "jaws" which separate at a rate of 5 inches per minute. The Instron cannot reliably stretch an entire canvas because the jaws of the device are not wide enough to accommodate any of Brushstrokes's reproductions.

On August 4, 2008, Emslander tested 3 Hallaryd brand art reproductions by randomly cutting 6 strips from each canvas—3 horizontally and 3 vertically. With the first and second reproductions, the canvas substrate broke before the thermoplastic layer cracked on all strips. On the third reproduction, the thermoplastic layer on all 6 test strips cracked before the canvas substrate broke. On visual inspection, Emslander found that all 6 strips from the third reproduction exhibited an extraordinarily high degree of texture concentrated in a small area when compared to the test strips from the other 2 reproductions. Emslander concluded that there were high stress concentrations and small cracks in the high-texture areas before the testing was performed. He explained that this occurred because the cracks present in the thermoplastic had been present initially and continued to widen as testing was performed.

Given these inconsistent findings, Emslander retested the third reproduction in 2009. He tested 1 horizontal and 1 vertical strip from that reproduction, selecting areas that did not exhibit abnormally high degrees of texture. In both strips, the thermoplastic layer did not break before the canvas. On April 28, 2009, Emslander tested another unidentified Hallaryd art reproduction that he purchased from IKEA. The thermoplastic layer of the 3 horizontal and 3 vertical strips did not crack before the canvas broke.

Emslander's report contains black and white photographs that make it difficult to identify the image pictured.

OPINION

## I. Legal Standard

Summary judgment is appropriate when, after both parties have the opportunity to submit evidence in support of their respective positions and the court has reviewed such evidence in the light most favorable to the nonmovant, there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* F.R. Civ. P. 56(c). A fact is material only if it might affect the outcome of the suit under the governing law. Disputes over unnecessary or irrelevant facts will not preclude summary judgment. A factual issue is genuine only if the evidence is such that a reasonable factfinder, applying the appropriate evidentiary standard of proof, could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (l986). Under Rule 56(e) it is the obligation of the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.

"'Summary judgment on the issue of infringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents.'" *U.S. Philips Corp. v. Iwasaki Elec. Co.*, 505 F.3d 1371, 1374-1375 (Fed. Cir. 2007) (quoting *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005)). Patent infringement analysis consists of two steps. First, the patent claims must be interpreted or construed to determine their meaning and scope. Second, the properly construed claims are compared to the process or product accused of infringing. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.

Cir. 1995). The first step of this analysis, claim construction, is a matter of law reserved to the court. *Id.* at 970-71. To establish infringement, plaintiffs must prove that each claim element is present in the accused product. *In re Gabapentin Patent Litigation*, 503 F.3d 1254, 1259 (Fed. Cir. 2007); *Dawn Equipment Co. v. Kentucky Farms Inc.*, 140 F.3d 1009, 1015 (Fed. Cir. 1998). "Direct infringement requires a party to perform or use each and every step or element of a claimed method or product." *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir. 2007).

Plaintiffs must prove infringement by a preponderance of the evidence. *Nutrinova Nutrition Specialties and Food Ingredients GmbH v. International Trade Commission*, 224 F.3d 1356, 1359 (Fed. Cir. 2000). Conversely, Brushstrokes can prevail by proving that at least one element of the asserted claim is absent from its products.

## II. Grouping of Accused Products

Brushstrokes contends that Baratto has failed to identify which of its hundreds of accused products infringe the '041 patent and has only produced evidence that one of six IKEA images marketed under the Hallaryd brand infringes the patent. Baratto counters that all elements of Claim 1 of the '041 patent are literally present in all of Brushstrokes's art reproductions. This court recently addressed the issue of grouping accused products in *Fujitsu Ltd. v. Netgear, Inc.*, 2009 WL 3047616, *3 (W.D. Wis. Sept. 18, 2009), in which Judge Crabb made clear that it is plaintiff's burden to prove by a preponderance of the evidence that each accused product practices all the elements of at least one claim of an asserted patent. Although Baratto may group products to escape the requirement of adducing evidence regarding every accused product,

he must support his grouping choices with evidence that every product made by Brushstrokes actually functions in the same manner.  *Id.*  Baratto has not done this.

Baratto asserts that the only difference between Brushstrokes's various products is with respect to the type of substrates (Mexican or North American cotton canvas) and thermoplastic layers (PVC or polystyrene), all of which were tested by Emslander.  It is undisputed that Brushstrokes's reproductions fall into one of two categories: polystyrene adhered to Mexican canvas or PVC adhered to either a Mexican or domestic canvas.  However, as discussed at length above, Emslander's initial and rebuttal expert reports—the only evidence upon which Baratto may rely—indicate that he tested only reproductions using a polystyrene thermoplastic layer and a Mexican cotton substrate.  Therefore, Brushstrokes is correct that Baratto's evidence of infringement is limited to those products identified in Emslander's original report: four unidentified Hallaryd brand art reproductions.

Another problem arises, however, because Baratto has failed to show that all Hallaryd brand art reproductions function in the same manner.  It is undisputed that the texture of each of Brushstrokes's reproductions is unique and that areas with more texture tear more easily when stretched.  Emslander fails to account for these differences in his original and rebuttal reports.  Emslander states in his report that he randomly selected 6 strips from each of the reproductions.  Therefore, it is impossible to know whether Emslander's test results can be extrapolated to all of Brushstrokes's Hallaryd images.  In fact, as Brushstrokes points out, Emslander had to retest one reproduction because the thermoplastic layer already had cracked in areas with high texture.  This tends to support the conclusion that elongation will depend on the amount of texture in any given image.

In any event, without more, no reasonable jury could rely upon Emslander's opinion in finding that all Hallaryd reproductions function in the same manner.  Grouping does not work when the only evidence supporting such grouping is merely that "different versions of a product are part of the same family and have the same basic functionality." *Fujitsu*, 2009 WL 3047616, *4.  "Slight variations in product functionality may be the difference between infringement and non-infringement by that product." *Id.*  In this case, it is undisputed that different texturization in a reproduction affects its performance.  Accordingly, I will disregard Baratto's attempts to group products or to group versions of products.  Therefore, only those four products actually tested by Emslander in preparing his original report will be considered.

## III.  Infringement

Remaining at issue with respect to infringement in this case is whether the four products tested by Emslander meet the following elements of claim 1 of the '041 patent:

> An art reproduction comprising a substrate, a textured colored sheet comprising a color layer and a flexible thermoplastic layer, and a flexible adhesive disposed between the substrate and the sheet, wherein the color layer of the sheet is exposed, and the thermoplastic layer of the sheet is laminated to the substrate, and wherein said reproduction has sufficient elongation so that when it is stretched, the adhesive and thermoplastic sheet elongate with the substrate to the breaking point of the substrate, and the reproduction does not crack.

Brushstrokes argues that the four reproductions at issue 1) do not have the claimed thermoplastic color layer, 2) are not "exposed" because a coating was applied to each image and 3) do not stretch to the breaking point of the canvas substrate.  Because Baratto has failed to adduce admissible evidence showing that the thermoplastic color layer element is present in the

23

accused products, he cannot prevail on his infringement claims. *Gabapentin*, 503 F.3d at 1259 (to prove infringement, patent plaintiff must prove that *each* claim element is present in accused product). Therefore, it is unnecessary to address Brushstrokes's arguments with respect to the other 2 elements ("exposed" and elongation) of the claim.

The claim language requires that the art reproduction have a "colored sheet comprising a color layer and a flexible thermoplastic layer." The parties disagree about the meaning of this term, leaving it to the court to decide. When construing disputed terms in a claim, a court generally should give the terms their ordinary and customary meaning. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The ordinary and customary meaning of terms "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corporation*, 415 F. 3d 1303, 1313 (Fed. Cir. 2005). The Court of Appeals for the Federal Circuit has held that the person of ordinary skill in the art would read a term both in the context of the claim in which it appears and "in the context of the entire patent, including the specification." *Id.* (citing *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)). Additionally, a patent's prosecution history can be relevant to construing disputed terms of a patent because it "provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317.

Brushstrokes believes that the colored sheet described in claim 1 must be comprised of 2 plastic layers fused together as opposed to a single plastic layer that is printed with non-thermoplastic ink. Baratto contends that the "color layer" is not necessarily a second thermoplastic layer but rather can be the printed ink itself, which has thermoplastic properties. I agree with Baratto's construction.

The patent specification instructs that the "colored sheet of the invention comprises a thermoplastic layer and a printed color layer that is also thermoplastic." Col. 5, lns. 28-30. It further states that thermoplastic means "the material exhibits plastic deformation or flow when heated." *Id.* at lns. 30-33. The specification later clarifies that "the thermoplastic layer or film is printed to provide a colored sheet, *i.e.*, a printed sheet, having a thermoplastic layer and a printed or colored image layer." Col. 6, 47-51. Nothing in the claim language or the specification states that the colored sheet has to include 2 plastic layers. One layer may be comprised of the ink and the other of polystyrene or another similar plastic product. I agree with Brushstrokes that the color layer must be thermoplastic, but the specification makes clear that thermoplastic means that the *material*—in this case, the ink—exhibits plastic deformation or flow when heated. Thus, the material does not have to be plastic in order to be thermoplastic; it only needs to act like plastic when heated.

Therefore, to prove infringement, Baratto must show that the four Brushstrokes images have a colored sheet that has a thermoplastic layer or film made of polystyrene and a color layer that exhibits plastic deformation or flow when heated. The undisputed facts show that the accused Brushstrokes's images are printed with colored ink on polystyrene. However, Baratto has not submitted admissible evidence showing that the ink used in these Brushstrokes products is thermoplastic, creating the necessary thermoplastic color layer. In his original report, Emslander states only that he observed "a color layer and a flexible thermoplastic layer" in the Brushstrokes's reproductions. Dkt. 57, Exh. 1 at 1. He explains generally that the "print layer . . . provides the image or picture of the art reproduction" and "is fixed to the top of the thermoplastic layer." *Id.* at 4. Emslander says nothing about the color layer being thermoplastic.

25

It is only in his later affidavit that Emslander states that the color or printed layer used by Brushstrokes is thermoplastic because the layer flows when heated.  Dkt. 57, ¶ 17.

Baratto acknowledges this fact in his response brief, in which he asserts that Hasting's "affidavit does not state, one way or another, whether or not Brushstrokes ink layer/color layer has thermoplastic properties.  Rather his affidavit dodges this issue. . . .  Expert Emslander, on the other hand, does directly address this issue in his affidavit."  Def.'s Resp. Br., dkt. 52 at 13.  As discussed above, this opinion was not in Emslander's original report and has been excluded as an improper supplement.  Because Baratto has produced no other evidence that the 4 Brushstrokes's reproductions have a color layer that is thermoplastic, he cannot show that those products infringe the '041 patent.  Accordingly, Brushstrokes is entitled to summary judgment on Baratto's infringement claims.


## IV.  Invalidity and Laches

Brushstrokes also has moved for summary judgment on the grounds that 1) the '041 patent is invalid because the accused products anticipate the '041 patent and the prior art makes obvious all of the elements of claim 1; and 2) Baratto knew or should have known about Brushstrokes's products since the mid-1990s but delayed bringing suit (laches defense).  The Court of Appeals for the Federal Circuit has held that a district court has the discretion to dismiss invalidity counterclaims upon a grant of summary judgment of non-infringement. *Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1468 (Fed. Cir. 1998); *Cardinal Chemical Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95 (1993) (in addressing motion for declaratory judgment district court has discretion to decide whether to exercise jurisdiction even when

established).  It is appropriate for a district court to address only the infringement issue when non-infringement is clear and invalidity is not plainly evident.  *Id.* (citing *Leesona Corp. v. United States*, 530 F.2d 896, 906 n. 9 (Ct. Cl. 1976)).

Discretionary dismissal of Brushstrokes's invalidity counterclaim is appropriate in this case because Baratto has not shown that the accused products infringe every element of the '041 patent and it is not plainly evident whether the patent is invalid.  A finding of invalidity would require combining several pieces of prior art and reviewing 3 additional patents.  It would be an unnecessary expenditure of judicial and party resources to explore these issues at this time when Brushstrokes has not given the court any reason to believe that it is at risk of a future infringement suit concerning the '041 patent.

Because I am granting summary judgment for Brushstrokes on the core issue of non-infringement on clear grounds and because Brushstrokes's counterclaim for invalidity is less certain, I am exercising my discretion and dismissing without prejudice Brushstrokes's invalidity counterclaim.  Accordingly, Brushstrokes's affirmative defense of laches is denied as moot.  Also moot is Brushstrokes's request that Baratto's damages be limited to the date on which Baratto first notified Brushstrokes of alleged infringement.

ORDER

It is ORDERED that:

(1)  Brushstrokes's motion for leave to file a reply brief in support of its motion to strike (dkt. 68) is GRANTED;

(2)  Brushstrokes's motion to strike portions of Emslander's affidavit (dkt. 63) is GRANTED with respect to the last 3 sentences of paragraph 5 and paragraphs 11-19 of the affidavit and DENIED with respect to the first 4 sentences of paragraph 5 and paragraphs 6-9 of the affidavit;

(3)  Defendant Brushstrokes Fine Art, Inc.'s motion for summary judgment (dkt. 44) is GRANTED;

(4)  Brushstrokes's counterclaim asserting invalidity is DISMISSED without prejudice; and

(5)  The clerk of court is directed to enter judgment in favor of Brushstrokes with respect to Baratto's claims for infringement of claim 1 of United States Patent No. 5,721,041, to dismiss the remaining claims and counterclaims without prejudice and to close this case.

Entered this 24th day of March, 2010.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge